IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION


EAST TENNESSEE NATURAL GAS, LLC,   )
                      )
     Plaintiff,            )
                      )
v.                      )
                      )
1.28 ACRES IN SMYTH COUNTY, VIRGINIA, )   Civil Action No.
LOUISE JOHNSTON, and          )   1:06-cv-00022
UNKNOWN OWNERS           )
                      )
and                  )
                      )
3.62 ACRES IN TAZEWELL COUNTY,   )   Civil Action No.
VIRGINIA, CIRCLE P FARMS, INC.,    )   1:06-cv-00028
and UNKNOWN OWNERS         )
                      )
and                  )
                      )
0.16 ACRE IN TAZEWELL COUNTY,    )   Civil Action No.
VIRGINIA, TERESA ANN PRUETT OSTOVAR )   1:06-cv-00029
AKA  TERESA PRUETT, and        )
UNKNOWN OWNERS           )
                      )
and                  )
                      )
2.73 ACRES IN TAZEWELL COUNTY,   )   Civil Action No.
 VIRGINIA, VIRGINIA HOLDING      )   1:06-cv-00036
CORPORATION and UNKNOWN OWNERS )
                      )
and                  )

- 1 -

| 21.85 ACRES IN TAZEWELL COUNTY, | ) | Civil Action No. |
| VIRGINIA, SOUTHERN REGION | ) | 1:06-cv-00037 |
| INDUSTRIAL REALTY, INC.,  ANKER | ) | |
| VIRGINIA MINING COMPANY, INC. aka | ) | |
| WHITE WOLF ENERGY, INC., BLUEFIELD | ) | |
| TIMBER, LLC, POCAHONTAS LAND | ) | |
| CORPORATION and UNKNOWN OWNERS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| .31 ACRES IN TAZEWELL COUNTY, | ) | Civil Action No. |
| VIRGINIA, NORFOLK SOUTHERN | ) | 1:06-cv-00044 |
| RAILWAY COMPANY | ) | |
| | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATION

These related cases were filed by East Tennessee Natural Gas, LLC, ("ETNG"), under the Natural Gas Act, 15 U.S.C.A. § 717f(h) (West 1997), seeking to acquire by eminent domain a right-of-way and easement over certain parcels of land in Tazewell and Smyth Counties for the purpose of constructing a 32-mile-long, 20-inch-diameter pipeline to transport natural gas from Jewell Ridge in Tazewell County to an existing ETNG pipeline system in Smyth County, ("the Jewell Ridge Lateral").  Jurisdiction is conferred to this court by 15 U.S.C. §717f(h) and 28 U.S.C. § 1331. These matters are before the court on the motions of ETNG in each of these cases for immediate possession.  These motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  Hearings were held on ETNG's motions for immediate possession on April 6 and 11, 2006. As directed by the orders of referral,

Case 1:06-cv-00036-GMW-PMS   Document 23   Filed 04/26/06   Page 2 of 31   Pageid#: 282

the undersigned now submits the following report and recommended disposition.

## I. Factual Background

ETNG is a natural gas company engaged in the transportation of natural gas through a pipeline system extending from central Tennessee through Virginia to North Carolina and south to Georgia. ETNG is a subsidiary of Duke Energy. On February 8, 2006, the Federal Energy Regulatory Commission, ("FERC"), granted ETNG a certificate of public convenience and necessity, ("the Certificate"), to construct the Jewell Ridge Lateral. The Certificate authorizes ETNG "to construct, own, operate, and maintain natural gas facilities, as described and conditioned herein, and as more fully described in the application." Certificate at 23. The Certificate states that the authority to construct the pipeline is conditioned upon a number of items, including:

> (1)     East Tennessee's completion of the authorized construction of the proposed facilities and making them available for service within one year of the issuance of this order...;
>             ...
> (4)     East Tennessee's compliance with the environmental conditions listed in Appendix A to this order.

Certificate at 24.

Paragraph No. 4 of Appendix A to the Certificate states:

> East Tennessee's exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to this Order must be consistent with these authorized facilities and locations....

- 3 -

Certificate at 26. Paragraph No. 18 of Appendix A requires ETNG to consult with the Virginia Department of Game and Inland Fisheries and the U.S. Fish and Wildlife Service to develop a schedule for the pipeline crossings of seven specifically listed waterbodies.

Paragraph No. 80 of the Certificate states:

> The Department of Mines, Minerals and Energy commented that East Tennessee should consider underground coal mines along the route. As stated in the [Biological Assessment] prepared for this project, East Tennessee consulted mining operators along the proposed pipeline route, including those within the Middle Creek and Indian Creek watersheds. No known underground mine works are located along or crossed by the proposed route.

The Environmental Assessment issued by the FERC, ("EA"), (Plaintiff's Exhibit No. 16), states:

> The proposed pipeline would cross two physiographic provinces in southwest Virginia: the Appalachian Plateau and Valley and Ridge Physiographic Provinces. Between approximate MPs [mileposts] 0.0 and 6.0, the pipeline would cross the Appalachian Plateau. The Appalachian Plateau Physiographic Province is characterized by narrow ridges and deep valleys eroded into relatively flat-lying Lower and Middle Pennsylvania coal bearing rocks.

> The New River and Kanawha formations overlie the area along the pipeline route. These formations are coal bearing formations consisting of alternating and interlaminated beds of sandstone, shale and coal. Coal is the principal mineral resource along this portion of the proposed

- 4 -

pipeline. It occurs in approximately 50 beds; 25 are of sufficient thickness and extent to be significant resources.

(EA at 16.) It further states:

> Most of the mineral resources in the Project area are associated with the coal and natural gas fields of CNX Gas at the northern end of the Project (approximate MPs 0.0 to 6.0).... Because excavation of mineral resources from within the permanent pipeline [right-of-way] would not be permitted for safety reasons, East Tennessee is working with landowners and mining operators to avoid and minimize limitations on future development of these resources.

> Anker Mining ... is planning to commence construction of a coal mining operation that would be located between approximate MPs 0.5 and 3.8. Construction is expected to start in 2006, with partial operations beginning in 2007, and full operation in 2008. Norton Coal recently received approval to develop a 388-acre surface mine expansion approximately 2,000 feet west of MP 2.0.... East Tennessee would continue to work with these operators to avoid areas containing potentially exploitable mineral resources, or any areas of former subsurface mining activities where shafts or cavities may be present.

(EA at 17.)

It also states:

> ... East Tennessee focused the development and analysis of potential corridors on the following considerations and factors:

> Avoidance of significant or sensitive land, such as ... abandoned mines....

- 5 -

(EA at 79.)

The Jewell Ridge Lateral, once constructed, will connect CNX Gas Company, LLC's, ("CNX Gas"), existing Cardinal States Gathering System in Tazewell County to ETNG's existing pipeline system in Smyth County. The Certificate also authorizes the installation of two "taps," which would allow the communities of Richlands and Cedar Bluff to access a supply of natural gas in the future. The capacity of the Jewell Ridge Lateral will be 235,000 Dths, ("dekatherms"), per day or 235 million cubic feet of natural gas per day.

Of the 20 condemnation cases filed in this court by ETNG regarding the Jewell Ridge Lateral project, the landowners in only six of these cases are contesting ETNG's request for immediate possession. In each of these cases, with the exception of Civil Action No. 1:06cv00044, ("the Norfolk Southern Case"), ETNG filed complaints on February 28, 2006, along with motions for immediate possession. The complaint and motion for immediate possession in the Norfolk Southern Case were filed on March 27, 2006. Attached to each of these complaints were two exhibits purporting to identify the tracts of land over which ETNG was seeking an easement and right-of-way. In each of these cases, with the exception of the Norfolk Southern Case, Exhibit 1 to the complaint contains a written "Legal Description" of the property affected, which identifies the property by its known owners and by Tazewell County Tax Map plat number and reference to the recorded deed to the property. In the Norfolk Southern Case, Exhibit 1 identifies three parcels by milepost location on a Norfolk Southern track map. Exhibit 2 to the complaint in each of these cases contains maps of the affected parcels of land showing the location of the easement and

- 6 -

right-of-way sought.

The complaints in each of these cases, with the exception of the Norfolk Southern Case, describe the interest to be acquired and the use of that interest as:

> [A] perpetual easement and right-of-way for the purposes, presently and at any such time in the future as Plaintiff may elect, of constructing, maintaining, operating, renewing, repairing, relocating, removing and/or replacing the certificated pipeline in a manner consistent with the FERC's regulations, a pipeline for the transportation of natural gas, and all appliances, appurtenances, fixtures, equipment, and facilities, whether above or below ground, deemed by Plaintiff to be necessary or desirable in connection with such line. Plaintiff further seeks to acquire the right to use a temporary work space during the construction of its pipeline, temporary access roads and a space parallel and contiguous to the permanent and right-of-way. After construction is complete, the temporary work space will revert to Defendants. ...
>
> ... Defendants will reserve and have the right to cultivate or otherwise make use of the lands for purposes in a manner which will not interfere with the enjoyment or use of the rights, easement, and estate sought by Plaintiff, but Defendants shall not construct, nor permit to be constructed, any houses, buildings, lakes, ponds, structures or any obstructions on or over said right-of-way, or any part thereof, as surveyed or finally determined. Additionally, Defendants shall not alter or change the grade of the Property.... Plaintiff further seeks the full right and authority to lease, sell, assign, transfer and/or convey to others the right-of-way, estate, interest, rights, and privileges hereby granted, in whole or in part, or in the interest herein, or to encumber the same.

In the Norfolk Southern Case, the complaint describes the interest to be acquired and the use of that interest as:

- 7 -

[A] perpetual easement and right-of-way for the purposes, presently and at any such time in the future as Plaintiff may elect, of constructing, maintaining, operating, renewing, repairing, relocating, removing and/or replacing the certificated pipeline in a manner consistent with the FERC's regulations, Defendant's construction specification for rail crossings, ... a pipeline for the transportation of natural gas, and all appliances, appurtenances, fixtures, equipment, and facilities, whether above or below ground, deemed by Plaintiff to be necessary or desirable in connection with such line. Plaintiff further seeks to acquire the right to use as temporary workspace during the construction of its pipeline, temporary equipment crossings and a space parallel and contiguous to the permanent easement and right-of-way. After construction is complete, the temporary workspace will revert to Defendant. ... Defendant will reserve and have the right to maintain and operate their existing rail line and otherwise make use of the lands for purposes in a manner which will not interfere with the enjoyment or use of the rights, easement, and estate sought by Plaintiff, but Defendant shall not construct, nor permit to be constructed, any houses, buildings, lakes, ponds, structures or any obstructions on or over said right-of-way, or any part thereof, as surveyed or finally determined except facilities reasonably necessary for the maintenance and operation of the existing rail lines. Additionally, Defendant shall not alter or change the grade of the Property... without the consent of Plaintiff. Plaintiff further seeks the full right and authority to lease, sell, assign, transfer and/or convey to others the right-of-way, estate, interest, rights, and privileges hereby granted, in whole or in part, or in the interest herein, or to encumber the same.

According to Clinton Montgomery "Monty" Collins, ETNG's Project Manager for the Jewell Ridge Lateral project, the Certificate the FERC granted requires that the pipeline be constructed and in service within one year from February 8, 2006, the date on which the Certificate was issued. Collins testified that the pipeline would be constructed in sequence starting with the northern end of the pipeline at Jewell Ridge and traveling south to Smyth County. Collins described the process as a "moving

- 8 -

assembly line." According to Collins, the route of the pipeline takes it across the land of approximately 79 different landowners, including four major mountains, Paint Lick Mountain, Brushy Mountain, Walker Mountain and Clinch Mountain and seven waterbodies.

Kimberly A. Chessler, Duke Energy's Environmental Coordinator for the Jewell Ridge Lateral project, also testified that the Certificate granted by the FERC requires ETNG to comply with certain environmental standards, including a requirement to comply with permits issued by the Virginia Marine Resources Department and the U. S. Department of Fish and Wildlife which require that all waterbody crossings must be constructed between June 1 and August 15, 2006, so as to be least disruptive to certain species of freshwater mussels found in Southwestern Virginia.

Collins testified that in order to make the waterbody crossings during the required time period, construction needed to start on the northern end of the pipeline by the end of April 2006. Collins stated that while it was technically feasible to skip around a tract of line in the construction project, to do so would make the project prohibitively expensive. He estimated that it would cost approximately $420,000.00 to "move around" a specific tract of land.

Collins testified that ETNG began the "pre-filing" process to gain permission to build the Jewell Ridge Lateral in November 2004. The application for the Certificate was filed with the FERC on September 8, 2005. According to Collins, the application presented to the FERC for approval included "alignment sheets" showing

- 9 -

the proposed route of the pipeline over each of the properties at issue. Collins stated that these alignment sheets showed all property sought to be used by ETNG on either a permanent or temporary basis, including all proposed access roads. The Certificate was issued on February 8, 2006.

At the April 6, 2006, hearing, a dispute arose as to whether the rights-of-way and easements, as described in the attachments to the complaints in the cases involving Circle P Farms and Teresa Pruett Ostovar, had been approved by the FERC in the issuance of the Certificate. In particular, the defendants had asserted that a rerouting of the crossing of the Clinch River at this location had not been included in the filings approved by the FERC. Subsequent to the hearing, ETNG filed the affidavits of Patrick W. Johnson, who conducted the survey for the reroute of the alignment of the pipeline over these properties and prepared the site specific easement maps filed with the complaints, and Patricia Patterson of TRC Environmental Corporation, which prepared the U.S. Geological Survey maps of the proposed pipeline route which were submitted to the FERC along with the FERC Environmental Assessment dated December 2005. This evidence shows that the revised pipeline route over these properties, as contained in the Environmental Assessment dated December 2005 and approved by the FERC in the granting of the Certificate, is the same route as set out on the site specific plats filed with the complaints in these cases.

Collins also stated that before construction could begin, a formal Implementation Plan with updated alignment sheets had to be filed with and approved by the FERC. Collins stated that it would take approximately 17 weeks from the start

- 10 -

of construction to the "in-service" date – the date the pipeline would be able to be placed in service.

Collins also testified that it was very important to construct the pipeline over the mountains in a timeframe that would allow all restoration work to be completed before bad weather could interrupt in the fall and winter. In fact, Collins stated that the terrain along the proposed route was such that it would not be safe to work in those areas in winter weather.

Collins stated that the property owned by Circle P Farms and Ostovar stands at mile 10.5 of the Jewell Ridge Lateral.

ETNG also filed identical affidavits in each of these cases from Collins as attachments to its memorandum in support of its motion for immediate possession. In these affidavits, Collins states:

> If ETNG is forced to begin construction without acquiring the right of immediate possession, construction costs will be increased enormously by the necessity of having to move construction points from site to site. The cost of skipping over a property to resume pipeline construction is up to $250,000.00 per skip. Further, compliance with the FERC order for completion of the pipeline will be a practical impossibility if construction must await completion of the just compensation trials for approximately 30 land owners with whom ETNG at this point has been unable to reach agreement for the required rights of way and easements. The cost to ETNG for a year's delay of the project would be $5,400,000.

Daniel Bernhard, Construction Superintendent of Field Operations for Duke Energy, testified that ETNG had a contractor under contract to begin construction of

- 11 -

the Jewell Ridge Lateral as soon as ETNG could gain access to the property. Bernhard stated that it would take 16 weeks and five days, or 101 days, working six days a week, to construct the pipeline and to place it in service.

Bernhard testified that some of the mountain crossings involved very steep terrain with somes slopes as steep as 60 degrees. Bernhard stated that it would be impossible from a safety standpoint for construction crews to work on these slopes in the winter months. Bernhard stated that the first waterbody to be crossed by the pipeline going from north to south is the Clinch River at mile 10 of the pipeline, adjacent to the Circle P Farms property. The southernmost waterbody to be crossed by the pipeline is Little Tumbling Creek at mile 25 of the pipeline. Bernhard estimated that it would take approximately four to five weeks to construct the pipeline from its starting point at Jewell Ridge to the Clinch River crossing point. Bernhard also stated that it was important to finish the project early enough in the fall so that the pipeline route could be reclaimed and seeded in an effort to get vegetation regrowing on the hillsides before winter to control soil erosion.

Bernhard testified that he had reviewed the plats attached to the complaints in case nos. 1:06cv00036, 1:06cv00037 and 1:06cv00044 and that those plats were the same as those included for these properties in Supplement No. 1 to the Initial Implementation Plan. (Plaintiff's Exhibit No. 1, 4/11/06 Hearing.) According to Bernhard, the gas pipeline would be installed under the railroad tracks at each of three railroad crossings. Bernhard stated that the installation would be accomplished by digging a bore pit on each side of the railroad track and then by boring horizontally using a conventional boring method under the railroad bed.  Bernhard stated that the

- 12 -

bore hole would be lined with a casing and the pipeline then installed through that casing. He stated that ETNG was prepared to meet all of Norfolk Southern's requirements to ensure that the construction of the pipeline and its ultimate operation would not affect or interfere with ongoing railroad operations in any way. Bernhard stated that he had been involved in other railway crossings, and that, on those occasions, the construction of the pipeline had not interfered with railroad operations.

Nell Gutierrez, Duke Energy's Manager of Regulatory Affairs, testified that she was responsible for preparation of ETNG's application to obtain the Certificate from the FERC. Gutierrez stated that initial alignment sheets showing the proposed route of the Jewell Ridge Lateral pipeline were included with ETNG's application for the Certificate that was filed with the FERC in September 2005. Gutierrez stated that ETNG is required to abide by the conditions placed upon the Certificate by the FERC. In particular, Gutierrez testified that Paragraph No. 4 to Appendix A to the Certificate allows ETNG to construct only those facilities and only on those locations listed in the Environmental Assessment, as supplemented by the alignment sheets. Certificate at 25. This paragraph also requires ETNG to file revised detailed survey alignment maps/sheets before the start of construction.

Gutierrez testified that these final revised alignment sheets are attached to an Implementation Plan filed with the FERC to gain final approval to start construction on the project. Gutierrez stated that this document, entitled Supplement No. 1 to the Initial Implementation Plan because it contained the final alignment sheets and other final information required by the FERC before granting approval to begin construction, was filed with the FERC by ETNG on March 21, 2006. (Plaintiff's

Exhibt No. 1, 4/11/06 hearing.) Any changes in the route of the pipeline must be approved by the FERC, Gutierrez stated.

Claude D. Morgan, Vice President of Operations for CNX Gas, testified that CNX Gas has signed a contract with ETNG to move natural gas from its Cardinal States Gathering System in Tazewell County through the Jewell Ridge Lateral to the existing ETNG pipeline in Smyth County. Morgan stated that CNX Gas currently uses the Columbia Transmission System, specifically the KA20 pipeline, to move its natural gas to market from this area. According to Morgan, the Jewell Ridge Lateral is needed because the Columbia Transmission System is limited in the amount of gas it can transport, especially during the summer months. The KA20 pipeline is an interstate pipeline that serves mainly eastern Virginia and has no storage facilities on the pipeline. Thus, Morgan testified, the pipeline's capacity at any one time is limited to the demand for natural gas in the market area that it serves.

Morgan stated that CNX Gas's Cardinal States gas field produces 165 dekatherms or 165 million cubic feet of natural gas a day. The current capacity on the KA20 pipeline during the summer months is 135 million cubic feet a day. Morgan stated that currently left CNX Gas with 30 million cubic feet of gas a day that it does not have the pipeline capacity to move during the summer months. He stated that the estimated daily loss of revenue to CNX Gas as a result of the inability to move this gas is $225,000.00 to $240,000.00 a day, with resulting lost severance tax revenues of approximately $6,000.00 a day. Morgan testified that during the summer months of 2005, CNX Gas lost the ability to market more that 1.1 billion cubic feet in natural gas from this gas field because it had no way to transport the gas to market. Some of this

- 14 -

gas is coalbed methane, which is released as a byproduct of mining activity, and it cannot be shut in. Thus, if there is not enough capacity on the pipeline to move that gas on any given day, Morgan stated, it simply is released into the atmosphere and lost. One of the advantages of moving gas on the ETNG system would be that the ETNG system has storage capabilities, according to Morgan.

Morgan testified that, since Hurricane Katrina struck the Gulf Coast last fall, there had been a shortage of natural gas available for use. In fact, Morgan stated that, had the United States not experienced a mild winter this year, the country would have found itself in "dire straits" due to the current shortage of natural gas.

William Craig Webb, Assistant Division Engineer of the Pocahontas Division of Norfolk Southern, testified that using the plats and descriptions attached to the complaint in the Norfolk Southern Case, he had attempted to locate and travel to the sites on the Norfolk Southern rail lines where ETNG seeks to locate the Jewell Ridge Lateral. Webb stated that, according to the complaint, ETNG was seeking rights-of-way and easements to cross Norfolk Southern rail lines in three different places in Tazewell County. The first proposed crossing, referred to as Parcel No. 1, is located on what Norfolk Southern calls its Big Creek Branch line. Webb stated that this line is crucial to Norfolk Southern's overall operation because it serves as an alternative route for rail traffic traveling on the Pocahontas Mainline, which runs from Portsmouth, Ohio, through Bluefield, West Virginia, and on to Norfolk, Virginia. Webb stated that rail traffic on the Pocahontas Mainline was very heavy and that the Big Creek Branch provided an alternative route for this traffic if there were any problems requiring detours around portions of the Pocahontas mainline. According

Case 1:06-cv-00036-GMW-PMS   Document 23   Filed 04/26/06   Page 15 of 31   Pageid#: 295

to Webb, Norfolk Southern also expects rail traffic on this line to greatly increase in the coming years because Norfolk Southern is participating in a joint venture with the states of Virginia, West Virginia and Ohio called the Heartland Corridor Project. The Heartland Corridor Project would increase the height clearance of tunnels and overpasses allowing for the double stacking of cargo containers on Norfolk Southern trains on the Pocahontas mainline.

Webb stated that he was able to locate and travel to the location identified as Parcel 1 and that he had no concerns with allowing the pipeline to cross the rail line at this location. Webb stated that he was concerned that the drawings attached to the complaint showed that the casing in which the pipeline would run under the track would lie flat rather than at an incline.  He stated that Norfolk Southern required such casing to lie on an incline to prevent ground water from gathering in the casing.

Webb also stated that he attempted to locate and travel to the location identified as Parcel 2. Webb stated that it appeared that this location was on what Norfolk Southern called its Dry Fork Branch line. Webb testified that, when he traveled to the site listed in the description, he did not find any survey markers.  He stated that he did find survey markers approximately .15 mile away from the described location, at milepost 42.94 rather than 43.06,  and that he assumed those were the markers left when ETNG had surveyed the proposed route for the Jewell Ridge Lateral. Webb stated that he had concerns about the pipeline crossing at either of these locations. In particular, he stated that the described location, at milepost 43.06, had a vertical rock wall on the south side of the track and a severe drop on the north side. At the location where Webb found the survey markers, that area was adjacent to a control point where

- 16 -

two tracks come together and where trains routinely stop to change crews. He also stated that this area was an old fill area, which caused concern for boring under the track.

Webb stated that he never was able to identify the location of Parcel 3. Webb stated that the Legal Description listed the location at milepost 31.06. Webb stated that the only place this milepost existed was on the Dry Fork Branch line about 15 miles out of Richlands. Webb also stated that on the plat of Parcel 3, milepost 31.06 is crossed out and someone has penciled in "CV 396.88." Webb stated that he also traveled to milepost 396.88 of the Clinch Valley line and found that the drawings in the plat attached to the complaint did not match that location either. Webb stated that he found no survey markers at either location.

Webb also stated that he was concerned that ETNG was seeking to prohibit Norfolk Southern from changing the grade at these three locations without ETNG's permission. Webb stated that this restriction would prevent Norfolk Southern from performing routine maintenance and repair work or even prevent cleanup after derailments without ETNG's permission.

Webb further testified that each of the plats attached to the complaint stated "Contractor shall follow all requirements of Norfolk Southern's NSCE-8 specifications." A copy of Norfolk Southern's NSCE-8 was admitted into evidence. Webb testified that the NSCE-8 listed a number of requirements on the construction over pipelines crossing Norfolk Southern's rail lines, including no entry on the property without a permit and no authorization to begin construction until an

- 17 -

agreement has been entered into with Norfolk Southern. Webb stated that if, in construction of the pipeline, ETNG followed all the requirements found in the NSCE-8, it would address Norfolk Southern's concerns about the impact of the construction of the pipeline on its rail operations.

Burton Perry, Senior Manager of Mining and Coal Resources for Pocahontas Land Corporation, a subsidiary of Norfolk Southern, testified that his company owned the mineral rights to a number of coal seams running under the property identified in case no. 1:06cv00036, ("the Pocahontas Land case.") Perry testified that there were current permits allowing mining on this property and that White Wolf Energy, Inc., ("White Wolf"), intended to open an underground mine on this property soon. Vaughn Miller, Manager of Land for the International Coal Group, a company affiliated with White Wolf, also testified that White Wolf owns a lease on all the coal seams owned by Southern Region Industrial Realty, Inc., ("Southern"). Miller further testified that White Wolf intended to open a major underground mine on this property to mine the War Creek coal seam in the next two years.

Perry testified that the only way to prevent surface subsidence from underground mining of coal was to extract only 50 percent of the coal and to leave the other 50 percent in place. If that were required in the mining of the coal reserves located under the proposed route of the Jewell Ridge Lateral across this property, Perry stated it would require leaving in place approximately one-half million tons of marketable coal. Perry also testified that there were extensive old mine works in various coal seams under the property.

- 18 -

While evidence was produced at both hearings on the negotiations between ETNG and each of these landowners, I do not recite that evidence in any detail because the parties have conceded that they have not reached agreements with regard to the properties sought to be condemned or the just compensation to be paid for the properties. Jay Dinkler, Supervisor for Land Acquisition for the Jewell Ridge Lateral project, testified that ETNG had made offers to each of the owners of the property at issue in these cases. According to Dinkler, the amounts of those offers were based upon information for similar properties contained in a sales data book compiled by a licensed Virginia appraiser documenting all recent sales in Tazewell and Smyth County. Dinkler testified that eventual appraisals of the properties to be taken were done and that at least some of those appraisals were for less than the amounts offered by ETNG.

## II. Analysis

### A.      Right To Condemn Property

The Natural Gas Act, ("the Act"), 15 U.S.C. § 717f(h), grants the holder of a certificate of public convenience and necessity the authority to acquire property by the exercise of the right of eminent domain for "the necessary right-of-way to construct, operate, and maintain a pipe line ... for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line" when it "cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid."

- 19 -

In these cases, it is undisputed that ETNG holds the Certificate issued by the FERC to build the Jewell Ridge Lateral. It also is undisputed that the parties in these cases have been unable to agree with regard to the compensation to be paid. The defendants in these cases contest ETNG's right to condemn, however, arguing that:

1.     ETNG has failed to prove that it has been unable to acquire the property by contract or to agree with the owners regarding the compensation to be paid, in that it has not shown that it has negotiated in good faith to do so;[1]

2.     The complaints seek to condemn more property rights than allowable under the Act; and

3.     The descriptions of the properties to be condemned contained in the complaints are inadequate.

Norfolk Southern also has raised an argument alleging that the exclusive jurisdiction to approve crossing of interstate rail lines rests with the Surface Transportation Board, ("STB"),   pursuant to the Interstate Commerce Commission Termination Act, ("ICCTA"), 49 U.S.C. §10501.

With regard to the defendants' argument that ETNG has not shown that it has negotiated in good faith, I agree with Judge Kiser's ruling in the "Patriot Project"

---

[1]Defendant Ostovar also argued that ETNG's failure to engage her in negotiations prior to filing suit meant that it could not meet the jurisdictional requirement to show that she was claiming compensation in excess of $3,000.00. *See* 15 U.S.C.A. § 717f(h). At the April 6, 2006, hearing, however, Ostovar's counsel conceded that ETNG had paid $3,000.00 into the court as compensation for the property rights it was seeking from Ostovar and that Ostovar was unwilling to accept that amount.

Case 1:06-cv-00036-GMW-PMS   Document 23   Filed 04/26/06   Page 20 of 31   Pageid#: 300

cases[2] that the reasoning of the Kansas district court in *Kan. Pipeline Co. v. A 200 Foot by 250 Foot Piece of Land,* 210 F. Supp. 2d 1253 (D. Kan. 2002), is persuasive. *See E. Tenn. Natural Gas Co. v. .65 Acres In Carroll County,* Civil Action No. 4:02cv00197 (May 12, 2003, W.D. Va.). As Judge Kiser did, I find that nothing in the Act or Federal Rule of Civil Procedure 71A requires the condemnor to negotiate in good faith. All the Act requires is a showing that the plaintiff has been unable to acquire the property by contract or has been unable to agree with the owner of the property as to the compensation to be paid. That has been conceded in each of these cases.

With regard to the defendants' arguments that the complaints seek to take more property rights than granted under the Act, I agree. However, I do not find that this error in pleading prevents these cases from going forward. Instead, I will recommend that the court hold that ETNG has the right to condemn only those rights allowed by the Act. In particular, the Act provides that the certificate holder may acquire by the exercise of the right of eminent domain only "the necessary right-of-way to construct, operate, and maintain a pipe line ... for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line...." 15 U.S.C.A. §717f(h). The express language of the Act does not grant the certificate holder the right to lease, sell, assign, transfer and/or convey to others the right-of-way. Nor is any mention of such rights contained

---

[2]The "Patriot Project" cases involved a number of condemnation cases filed by ETNG in the Danville Division of this court in late 2002 seeking to acquire easements and rights-of-way through Carroll, Floyd, Henry, Patrick and Wythe Counties for the construction of a 93.6-mile-long, 24-inch-diameter natural gas pipeline.

in the Certificate.

Therefore, I recommend that the court find that it can grant ETNG no more rights through these actions than those granted by the Act and the Certificate. Therefore, these actions should be construed as actions seeking easements and rights-of-way "to construct, operate, and maintain" the Jewell Ridge Lateral and for the location of the "equipment necessary to the proper operation of such pipe line."

With regard to the argument that the description of the property sought to be condemned is inadequate, Federal Rule of Civil Procedure 71A(c) requires only that "the complaint shall contain ... a description of the property sufficient for its identification." I find that the Legal Descriptions along with the attached plats meet the requirements of Federal Rule of Civil Procedure 71A(c). *See Southern Natural Gas Co. v. Land, Cullman County,* 197 F.3d 1368, 1375 (11th Cir. 1999) (legal description and plat map satisfies identification requirement of Rule 71A(c)(2); *Guardian Pipeline, L.L.C. v. 529.42 Acres of Land,* 210 F. Supp. 2d 971, 973 (N.D. Ill. 2002) (legal description and plat map satisfies identification requirement of Rule 71A(c)(2)). Furthermore, I find that the specific rights-of-way and easements sought to be condemned are the same rights-of-way and easements approved by the FERC in the issuance of the Certificate. In the Norfolk Southern Case, the complaint seeks, and the FERC has approved, crossings at three specific points on the rail lines. Thus, it appears that ETNG has the right to condemn those rights-of-way and easements, regardless of whether Norfolk Southern agrees that these are appropriate locations or not.

- 22 -

Other defendants argue that the complaints are insufficient because they do not identify what, if any, of the mineral rights ETNG seeks to condemn. ETNG has clearly stated that it seeks no mineral rights from these defendants. While there is no doubt that the construction of this pipeline across certain of these properties may affect the mineral rights owners' ability to mine these resources, that is an issue to be considered in the just compensation stage of these proceedings.

With regard to Norfolk Southern's argument that the STB retains exclusive jurisdiction to approve the crossing of its rail lines, it appears that the cases cited in support of this argument do not address the issue before the court. Instead, these cases address the issue of whether the federal ICCTA preempts state condemnation actions. Norfolk Southern has cited no authority to support its argument that this court's jurisdiction to enforce the FERC's certificates through federal condemnation actions under the Act is preempted by the STB's exclusive jurisdiction over rail transportation. In fact, the language of the ICCTA gives the STB exclusive jurisdiction over only "rail transportation." 49 U.S.C.A. § 10501(b) (West 1997).

The complaint in the Norfolk Southern Case specifically states that under the rights-of-way and easements sought by ETNG, "Defendant will reserve and have the right to maintain and operate their existing rail line." Furthermore, the evidence presented shows that ETNG has agreed to abide by all of Norfolk Southern's requirements for the construction and maintenance of pipelines under its rail lines so as not to interfere with its rail operations. That being the case, I find that construction of the Jewell Ridge Lateral will not have any substantial impact on rail transportation, and I reject Norfolk Southern's argument that this court does not have jurisdiction

- 23 -

over this case.

B.     Right To Immediate Possession

The Fourth Circuit has held that once a district court determines that a gas company has the substantive right to condemn property under the Act, the court may exercise its equitable power to grant the remedy of immediate possession through the issuance of a preliminary injunction. *See E. Tenn. Natural Gas Co. v. Sage,* 361 F.3d 808, 828 (4th Cir. 2004). In order to obtain the relief requested, the gas company must meet the standard for injunctive relief as set forth in *Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189, 193-96 (4th Cir. 1977). *See Sage*, 361 F.3d at 828. In *Blackwelder*, the Court set out four factors to be considered in analyzing a request for injunctive relief: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *See* 550 F.2d at 193-96. Furthermore, the Fourth Circuit has held that preliminary injunctions that mandate affirmative relief, such as an order of immediate possession, "'do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" *Sage*, 361 F.3d at 828 (quoting *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)). Based on the evidence before the court, I find that ETNG has met the standard for injunctive relief, and I will recommend that the court grant the motions for immediate possession.

The defendants argue that before the court may grant ETNG the right to

Case 1:06-cv-00036-GMW-PMS   Document 23   Filed 04/26/06   Page 24 of 31   Pageid#: 304

immediate possession it must require ETNG to post a bond as required by Federal Rule of Civil Procedure 65. Rule 65(c) states:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). Although a district court has discretion to set the bond amount "in such sum as the court deems proper," the rule requiring a bond is mandatory, and failure to require a bond upon issuing injunctive relief is reversible error. *Maryland Dep't. of Human Resources v. U. S. Dep't. of Agriculture,* 976 F.2d 1462, 1483 (4th Cir. 1992).

In these cases, as in the Patriot Project cases, ETNG has deposited into the court a sum of money which it has offered as just compensation in these cases. While the court heard little evidence as to the adequacy of these amounts, the evidence before the court shows that the amounts offered were based on amounts recently paid for similar properties in Tazewell County. That being the case, I recommend the court find that the amount deposited into the court satisfies the requirements of Rule 65. *See Sage,* 361 F.3d at 825-26 (gas company's deposit considered as a sufficient bond).

1.      *Success On The Merits*

As stated above, it is undisputed that ETNG has been granted a certificate of public convenience and necessity from the FERC. As a certificate holder, the Act grants ETNG the substantive right to condemn the property as approved by the FERC. ETNG also has produced evidence showing that the properties at issue in these cases were within the route of the pipeline approved by the FERC in the issuance of the Certificate. That being the case, I find that it is highly likely that ETNG ultimately will succeed on the merits of the case.

The defendants in these cases have introduced much evidence which attempts to call into question the propriety of the FERC's issuance of the Certificate and the propriety of the approved route of the Jewell Ridge Lateral pipeline. The defendants, however, cannot use these cases to engage in an appellate review of the propriety of this project. *See Williams Natural Gas Co. v. Okla. City*, 890 F.2d 255, 264 (10th Cir. 1989), *cert. denied,* 497 U.S. 1003 (1990).

In particular, the defendants in the Pocahontas Land case argue that ETNG has necessarily provided false information to the FERC in its application because the Certificate recites: "No known underground mine works are located along or crossed by the proposed route." Certificate at 22. A review of the entirety of the evidence before the court, in general, and the EA, in particular, shows that the FERC was aware of prior mining activity in the area and that new mines were planned to be opened in the area. I, therefore, can offer no explanation for the FERC's statement that the proposed route of the Jewell Ridge Lateral will not cross any known "underground mine works" other than to note that there is no evidence before the court of any currently active mining activities underneath the proposed route. The entirety of the

- 26 -

evidence before the court shows that the FERC was well aware that the area crossed by the proposed route contained extensive old mine sites.

2. *Likelihood Of Irreparable Harm To Plaintiff*

In *Sage*, the Fourth Circuit suggested that Judge Kiser's finding that "the Patriot Project would suffer 'undue delay' and that this delay would cause 'significant financial harm' both to ETNG and some of its putative customer's" was sufficient to meet the need to show likelihood of irreparable harm if the injunctive relief were not granted. *See* 361 F.3d at 828-29. I find that the facts presented in this case show that ETNG's Jewell Ridge Lateral project would suffer undue delay causing significant financial harm to both ETNG and CNX Gas if this court denies its request to take immediate possession of the properties at issue.

In these cases, ETNG has presented evidence that the Certificate the FERC granted requires that the pipeline be constructed and in service within one year from February 8, 2006, the date on which the Certificate was issued. ETNG also has presented evidence that the Certificate granted by the FERC requires ETNG to comply with certain environmental standards, including a requirement to comply with permits issued by the Virginia Marine Resources Department and the U. S. Department of Fish and Wildlife which require that all waterbody crossings must be constructed between June 1 and August 15, 2006. ETNG has presented evidence that, if it cannot complete construction of the Jewell Ridge Lateral project within these time restrictions, it may not construct this pipeline pursuant to the Certificate. While ETNG may be able to return to the FERC to seek amendments to the Certificate or even another certificate

- 27 -

eventually allowing construction of this pipeline, the evidence before the court shows that would create additional great expense and great delay in the project.

ETNG has presented evidence that it will take approximately 17 weeks to complete construction of the Jewell Ridge Lateral project from its northern starting point on Jewell Ridge to its southern ending point connecting to the existing ETNG pipeline system in Smyth County. The southernmost waterbody crossing is at mile 25 of the 32-mile pipeline. Further, ETNG has presented evidence that its contractor can complete the project sequentially to the point that the waterbody crossings can be completed during this June 1 to August 15, 2006, timeframe only if it is granted the right of immediate possession. It is important to note that the starting point on Jewell Ridge is contained in the property owned by Southern Regional Industrial Realty and is at issue in one of these cases. If the right of immediate possession is not granted, ETNG has shown that the only way it could construct the waterbody crossings within the required timeframe is to move around certain parcels, again at great expense and delay in the project.

The route of the Jewell Ridge Lateral also takes it across four prominent mountains. ETNG has produced evidence that construction on many of these mountain slopes cannot proceed during the winter months. ETNG also has produced evidence that if construction is not completed on these slopes in time to allow for reseeding and reforestation before winter, there could be environmental damage to these lands and local streams caused by soil erosion.

Finally, the evidence has shown that ETNG's customer, CNX Gas, will suffer

- 28 -

irreparable harm if this pipeline is not allowed to be constructed and placed into service as soon as possible. ETNG has presented evidence that CNX Gas's current transportation system cannot accommodate CNX's current production ability. Furthermore, the evidence has shown that there are substantial amounts of coalbed methane gas that CNX Gas will be forced to vent into the atmosphere unless the Jewell Ridge Lateral can be placed into service before the end of the summer months.

3.      *Likelihood Of Irreparable Harm To Defendants*

The defendants in this case have produced no evidence that they will suffer any additional harm other than the harm that they will inevitably suffer as a result of the taking of their property for this project.

4.      *Public Interest*

The evidence before the court shows that there is a substantial public interest at stake in this case – the need to capture and supply as much natural gas to the market as soon as possible.

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.      ETNG has a substantive right to condemn the properties at issue;

- 29 -

2.    ETNG's right to condemn is limited to seeking easements and rights-of-way "to construct, operate, and maintain" the Jewell Ridge Lateral and for the location of the "equipment necessary to the proper operation of such pipe line;" and

3.    The equities entitle ETNG to a preliminary injunction through an order granting ETNG immediate possession and use of the affected properties.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter an order bifurcating the proceedings regarding the plaintiff's right to condemn and motion for immediate possession from the just compensation proceedings, finding that ETNG has a right under the Act to condemn the properties at issue and granting ETNG's motion for immediate possession in each of these cases.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C § 636(b)(1)(C):

Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

- 30 -

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED:     April 26, 2006.


/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

- 31 -